

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00448-CV

**IN THE INTEREST OF A.J.O.**, A.J.C., A.L.C., and A.J.C., Children

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2022PA01834
Honorable Kimberly Burley, Associate Judge Presiding

Opinion by:     Rebeca C. Martinez, Chief Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Liza A. Rodriguez, Justice
                Lori Massey Brissette, Justice

Delivered and Filed: December 18, 2024

AFFIRMED

Mother and Father appeal from the trial court's order terminating their parental rights to Aiden, Ava, Anthony, and Asher.[1]  Both parents argue that the evidence adduced at trial is legally and factually insufficient to support the trial court's findings on the statutory grounds for termination under Texas Family Code section 161.001 and the finding that termination is in the children's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b).  We affirm.

---

[1] To protect the identities of the minor children, we refer to the parties and the children by aliases.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).  Because the children have similar initials, we employ fictitious first names.

## I. BACKGROUND

This case began on November 15, 2022, when the Texas Department of Family and Protective Services (the "Department") filed a petition to terminate Mother's and Father's parental rights to the children.[2] The Department had removed the children the previous day. The case proceeded to a two-day bench trial, held on April 15 and May 31, 2024. At the time of trial, Aiden was 6, Ava was 5, Anthony was 4, and Asher was one. Seven witnesses testified: Mother, Father, the court appointed special advocate ("CASA"), two Department investigators, and two Department caseworkers.

Mother testified that she and Father "always had this lingering relationship," which, according to Father, began in 2014. In 2019, the children were removed from their parent's care by the Department, but returned that same year. According to Mother, the three children (Asher had not been born at that time) were removed "because of ongoing domestic violence" between Mother and Father. In 2019, Mother successfully completed the services required for the return of her children, including parenting classes and counseling. Father was in jail when the children were returned to Mother. When Father was released,[3] she and Father tried to co-parent, according to Mother, but did not get back together as a couple initially. Mother testified that, in late 2021, she and Father had "relations," which resulted in Asher's birth in July 2022, and that, in mid-2022, she and Father rekindled their "relationship."

In June 2022, the Department became involved with the family again. According to the Department's investigator, the Department's first referral in 2022 was for "neglectful supervision."

---

[2] The Department sought termination of Mother's parental rights to all four children, but, as to Father, it sought termination only as to the three youngest children because Father was the legal father only to these three children. The alleged father to the eldest child could not be located, and the trial court terminated his parental rights. He did not appeal. For ease of reference, our use of the words "parents" and "family" excludes the alleged father, and our use of the word "children" and "family" includes all four children.

[3] It is unclear from the record when Father was released.

Sometime later that year, a second referral was made for domestic violence. In November 2022, the Department investigated a third referral, again for domestic violence, which led to the children's removal that month. In November 2022, the Department's investigator observed "a good amount of bruising all over" Anthony's body — "[h]is back; his bottom; his legs, front and back." Anthony is autistic, and, in late 2022, he was three and nonverbal. Ava made an outcry that she had seen Mother hit Anthony with a belt on his back. Aiden made a similar outcry that he had seen Mother and Father hit Anthony with a belt on his bottom. Mother and Father denied physically abusing Anthony — both in November 2022 and later at trial. Father testified that he never hit Anthony, "other than giving him a little spank on his butt." Mother testified that she once spanked Aiden with a belt, but not to the point of bruising, and never Anthony. The Department's investigator testified that Mother and Father, "never gave me a clear answer" as to how Anthony received bruising and they "mentioned the possibility" of the paternal grandmother as the perpetrator.

Additionally, in November 2022, Father suffered a black eye. At trial, he denied that the cause was domestic violence and stated that he received the black eye from his brother when they were "play fighting." When asked how long there had been domestic violence in his relationship with Mother, Father answered, "Well, there really wasn't domestic violence." In contrast, Mother testified that, for the majority of their eight-year relationship, Father was incarcerated; however, during periods when Father was not incarcerated, physical abuse, "was not something that was that much of a routine, but it was on a regular basis." Mother testified regarding Father's abuse:

> It started off with a lot of emotional abuse. The emotional turned into a lot of mental. And when I started, you know, questioning everything I know, I guess that's when the physical stuff started.

Mother specified that the physical abuse included hair pulling and shoving and that Father left bruises on her body. According to Mother, the last time Father physically abused her was in July 2022. She further testified that the children witnessed Father's physical abuse of Mother and "heard a lot of the vulgar language." Mother testified that she did not think Father was a safe person for the children to be around. The CASA testified that Aiden told her, "that his mom and dad would be mean to each other and hurt each other."

Both Mother and Father testified that they ended their relationship in December 2022. Nevertheless, the record shows that Mother and Father kept in close contact. After the children were removed, the Department enrolled Mother in a family violence prevention program. In January 2024, Mother was discharged from the program because of her continued communication with Father, after being notified on multiple occasions that she needed to refrain from contact with Father and his family. Mother acknowledged in her testimony that she was not open with the program about her communication with Father from November 2022 through her discharge in January 2024.

Father testified that he had not talked with Mother after December 2022, and he acknowledged that he was not able to talk with Mother because, "it puts my kids in jeopardy of returning home." However, the trial court admitted recordings of five telephone conversations between Mother and Father that occurred after Father was incarcerated in July 2023. The Department's caseworker testified that the records she reviewed indicated the parents talked daily. In the first recording, the parents discuss their issues with the Department, which Father refers to as, "[j]ust things we got to go through . . . to make us stronger as people and as a couple and as a husband and wife and as a family." Later in the conversation, Father says, "It's about work getting [sic] our kids." The parents also discuss Mother's use of an alias to employ when calling the parole

office to determine whether Father is eligible for release. The parents specifically discuss that the purpose of this plan is to prevent the Department from finding out about Mother's inquiry. In another phone call, the parents discuss a plan for Mother to answer her phone when the children are present, so Father can hear them.

In December 2023, Mother gave birth to a fifth child, and she testified that Father may have been this child's father. At that time, Mother resided in a home that provided transitional housing for up to two years. In January 2024, the baby became sick with a rhinovirus. In early February 2024, Mother moved to an apartment, and several days later, the baby died. The Department assigned an investigator to determine the cause of the baby's death.[4] At the time of trial, the investigation into the child's death was ongoing.

During the pendency of this case, the trial court ordered each parent to submit to a psychological evaluation, a drug-and-alcohol-dependency assessment, and random drug tests; to attend counseling; and to complete a parenting class. According to the Department's caseworker at the time of trial, Mother had not followed all recommendations from her dependency assessment, and Mother had not submitted to all required drug tests. Mother also had not continued with counseling, but she had completed her parenting class. Mother testified that she last used an illegal substance in April 2024, when she used a prescription painkiller, without a prescription, and a "CBD gummy." Mother also acknowledged that she tested positive for methamphetamine in July 2023, while she was pregnant, but she denied using methamphetamine. Additionally, she affirmed that she drank alcohol in January 2024, while in possession of her newborn. On the second day of trial, Mother submitted to a drug test, but her urine sample was unable to be tested because "the temperature was off."

---

[4] The investigator was initially assigned to investigate whether Mother drank alcohol while she was nursing. The result of that investigation was "unable to determine."

Father was incarcerated for much of the case. He testified that he finished parenting and anger-management classes while incarcerated, but had not finished a domestic violence prevention class. He also testified that he last used methamphetamine in March 2023.

Both parents had criminal records. Mother acknowledged that she had been arrested for assault causing bodily injury and the victim was her stepmother; however, the record does not provide further details. The Department's investigator testified that Father's criminal records extended back to 2010, and showed that Father had been convicted "for marijuana; assault causing bodily injury; driving while intoxicated; robbery; possession of a controlled substance and delivery of controlled substance; and, assaulting family." Three judgments were admitted into evidence: one for Father's possession of a controlled substance in 2020, another for felon in possession of a firearm in 2020, and the third for robbery in 2015. Father acknowledged that he was convicted twice for assault, once in 2013 or 2015 and again in 2020, with the victims being his mother and a woman he dated. In July 2023, Father was arrested for violating a condition of a pre-trial bond posted in connection with his arrest for possession of a controlled substance with intent to deliver. Father removed his ankle monitor in violation of his bond. From July 2023 through the time of trial, Father was incarcerated. The Department's caseworker testified that Father was due to be released in March 2026.

Father testified that, at the time of trial, he resided at a "therapeutic community rehabilitation center" in Houston and that he was eligible to return to San Antonio on parole in July 2024. At the time of trial, Mother lived in an apartment. The Department's caseworker testified that she tried to arrange a visit six times and went to the apartment unannounced twice, but she was unsuccessful in visiting the apartment. Mother attributed the missed visits to miscommunication. Mother testified that she worked as a security guard, but the caseworker

testified that Mother had not provided her with the information the caseworker required to verify Mother's employment.

Following removal, the children were placed in foster homes where they resided through trial. The two oldest children lived together, and two youngest children lived together. The caseworker testified that all children were bonded to their foster parents, and the foster parents wished to adopt the children in their care. According to the caseworker, the two sets of foster parents were committed to continuing contact among all siblings. Both the caseworker and the CASA testified that the children were bonded to their foster parents and that the foster parents were meeting the children's needs. The caseworker testified that the oldest child, Aiden, has ADHD, throws tantrums, and shows aggression. His sister, Ava, makes excuses for Aiden. The CASA testified that Ava was scared early on in the case but had come to see herself as smart, loved, and important. Both children were receiving therapy, and both reported to the CASA that they wished to remain in their foster home. The younger children, according to the CASA, were too young to express their desires. By the time of trial, Anthony was potty trained, and, according to the caseworker, he had learned how to communicate a few words and his behavior had improved. The caseworker testified that Anthony received play therapy, and Asher received speech therapy.

The CASA also testified that the children were bonded to Mother. However, the CASA was concerned about Mother's parenting skills. Mother was granted weekly visits with her children but missed several, even though they were scheduled at the same time each week. According to the CASA, who observed some visits, Mother was inconsistent in her parenting; she would punish Anthony but not Aiden when each performed the same action. The CASA also testified that Ava became upset when Mother called her a "rat" after Ava told her foster parents

that Father attended a visit he was not authorized to attend. The CASA further testified that she observed one visit Father was allowed, in which he was "very aggressive in his language with [Aiden]" and threatened Aiden "to tell him what [Mother] had said or done." According to the CASA:

> [Father] was cussing. He would start talking real fast and pacing around the room, and then lay down and almost fall asleep.
>
> He had [Aiden] punching with him, and then took the baby, [Asher], and had him punching [Aiden], which [Aiden] responded by punching [Father] in the groin. And he threatened, You never do that again to me.

Mother testified that she is aware the children have "some fears" about Father. The Department's caseworker, assigned to the case in February 2024, testified that Mother had missed three or four visits since she was assigned. The caseworker also testified that, after visits, the children sometimes left emotional, angry, and upset.

After receiving the evidence, the trial court signed an order terminating Mother's and Father's parental rights. The trial court found that Mother and Father each knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical and emotional well-being, *see id.* § 161.001(b)(1)(D), and that each failed to comply with the provisions of a court order that specifically established the actions necessary for the return of their children, *see id.* § 161.001(b)(1)(O). The trial court also found that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical and emotional well-being, *see id.* § 161.001(b)(1)(E), and that Father had constructively abandoned the children, *see id.* § 161.001(b)(1)(N). Additionally, the trial court found that termination of each parent's parental rights was in the children's best interest. *See id.* § 161.001(b)(2). Father and Mother appealed.

## II. STANDARD OF REVIEW

"A parent's fundamental right to the care, custody, and control of his child is of constitutional magnitude." *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022). To terminate that right, pursuant to section 161.001 of the Texas Family Code, the trial court must find by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

"This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d at 741. In reviewing a legal-sufficiency challenge:

> [A] court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Only when the factual sufficiency of the evidence is challenged, is disputed or conflicting evidence under review. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a

factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

### III. MOTHER

#### A. Predicate Ground (D)

Mother challenges both predicate grounds (D) and (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (O). Generally, to affirm a termination judgment, an appellate court need only uphold one statutory ground and the best-interest finding. *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). However, as here, when an appellant challenges the trial court's findings under grounds (D) or (E), due process demands that we review the evidence supporting at least one of those grounds. *Id.* at 237; *see also In re I.C.*, No. 04-23-00954-CV, 2024 WL 1543302, at *3 (Tex. App.—San Antonio Apr. 10, 2024, no pet.) (mem. op.). Because Father additionally challenges ground (E), and ground (E) is closely related to ground (D), we present the relevant law regarding both endangerment grounds in the following section, but we analyze each parent's issues separately. *See In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.) (noting (D) and (E) grounds are interrelated).

##### 1. Applicable Law

Section 161.001(b)(1)(D) allows a trial court to terminate parental rights if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Under subsection (D), the trial court examines "evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being," although parental conduct can be a factor that contributes to this environment. *In re J.T.G.*, 121 S.W.3d at 125.

"'Environment' refers to the acceptability of living conditions, as well as a parent's conduct in the home." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *Id.* "[A] parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.) (citation omitted).

Section 161.001(b)(1)(E) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under subsection (E), the trial court must determine whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being. *See In re J.T.G.*, 121 S.W.3d at 125.

In the context of both subsection (D) and (E), "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or mental health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re J.T.G.*, 121 S.W.3d at 125. "However, there are some distinctions in the application of subsections (D) and (E)." *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 713 (Tex. App.—El Paso 2012, no pet.). First, termination under subsection (D) is permitted based upon only a single act or omission. *In re R.S.-T.*, 522 S.W.3d at 109. On the other hand, under subsection (E), our analysis may not rest on a single act or omission; it must be "a voluntary, deliberate, and conscious course of conduct." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citation omitted). Second, in evaluating endangerment under subsection (D), we generally consider only the child's environment before the Department obtained custody of the child. *See In re J.W.*, 645 S.W.3d at 749; *In re S.R.*, 452

S.W.3d at 360. Under subsection (E), courts may consider conduct both before and after the Department removed the child. *In re S.R.*, 452 S.W.3d at 360.

2. Discussion

Predicate ground (D) generally relates to the children's environment before removal. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *In re J.W.*, 645 S.W.3d at 749. "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the conditions or surroundings of the child's home under section D." *In re A.L.S.*, 660 S.W.3d 257, 271 (Tex. App.—San Antonio 2022, pet. denied) (citation and brackets omitted). "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *See R.S.-T.*, 522 S.W.3d at 110 (citation omitted).

Here, substantial evidence of domestic violence was introduced, occurring at least from 2019 until the children's removal in 2022. Mother acknowledged that in 2019, the children were removed "because of ongoing domestic violence" between the parents. She acknowledged Father's violence toward her in front of the children, his emotional abuse, and his vulgar language. The CASA testified that Aiden told her Mother and Father "would be mean to each other and hurt each other."

While a parent's endangering conduct need not be directed at the child or the child actually suffer injury to establish a subsection (D) finding, such evidence was present in this case. *See In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024). The children came into the Department's care after Anthony was observed with extensive bruising on his back, bottom, and legs. Aiden and Ava both stated to the Department's investigator that they had seen Mother hit Anthony on the bottom or back with a belt. Although Mother denied harming Anthony, the trial court was free to disbelieve

her denial. *See In re J.F.C.*, 96 S.W.3d at 266; *see also*, *In re A.E.R.*, No. 04-24-00109-CV, 2024 WL 3588391, at *4 (Tex. App.—San Antonio Jul. 31, 2024, no pet.) (mem. op.) (holding trial court was free to credit child's outcry of abuse and disbelieve mother's denial that she caused child's bruising). Moreover, Mother offered no explanation for Anthony's bruising, and Father suggested his mother, with whom the children associated regularly, could have been a possible perpetrator. *See In re A.L.S.*, 660 S.W.3d at 272 (explaining inquiry into endangering environment extends to persons with whom child is compelled to associate with regularly). On this record, the evidence of actual harm to Anthony supports the trial court's endangerment finding, regardless of whom it believed or how it reconciled the evidence.

Additionally, there was some evidence indicating that violence was pervasive in Mother and Father's relationships outside the immediate family. Father asserted he obtained a black eye "play fighting" with his brother, and he was convicted for assault against his mother and a woman he dated. Mother acknowledged that she had been arrested for assaulting her stepmother. *See R.S.-T.*, 522 S.W.3d at 110 ("[P]ropensity for violence may be considered as evidence of endangerment.").

Altogether, the extensive evidence of violence adduced at trial committed by Mother and Father, with whom the children lived prior to removal, is legally sufficient to support the trial court's subsection (D) finding. The disputed evidence, including Mother's denial of harm to Anthony, is not so significant that it could prevent a reasonable factfinder from forming a firm belief or conviction that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *In re J.O.A.*, 283 S.W.3d at 344–45. Therefore, we overrule

Mother's challenge to the sufficiency of the evidence supporting the trial court's endangerment finding. *In re J.O.A.*, 283 S.W.3d at 346.[5]

## B. Best Interest

Mother also challenges the trial court's finding that termination of her parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

### 1. Applicable Law

There is a strong presumption that keeping a child with a parent is in a child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, it is equally presumed that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). In determining whether a child's parent is willing and able to provide the child with a safe environment, we consider the factors set forth in Texas Family Code section 263.307(b). *See id.* § 263.307(b).

Our best-interest analysis is guided by consideration of the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or

---

[5] Because only one predicate ground is necessary to support termination under section 161.001, we do not reach Mother's issue challenging the trial court's subsection (O) finding. *See* TEX. FAM. CODE ANN. § 161.001(b); *See In re D.B.S.*, No. 05-20-00959-CV, 2021 WL 1608497, at *7 (Tex. App.—Dallas Apr. 26, 2021, pet. denied) (mem. op.) ("Because the evidence is legally and factually sufficient to support the endangerment findings, we need not address the finding on subsection (O)."); *see also* TEX. R. APP. P. 47.1.

omissions. *See id.*; *accord In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013). The Department is not required to prove each factor, and the absence of evidence regarding some of the factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in a child's best interest, particularly if the evidence is undisputed that the parent-child relationship endangered the safety of the child. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The focus of our review is whether the evidence, as a whole, is sufficient for the trial court to have formed a strong conviction or belief that termination of the parent-child relationship is in the best interest of the child. *Id.*

### 2. Discussion

As detailed above, the evidence supports the trial court's endangerment finding based on the violence to which the children were exposed. *See In re S.A.*, No. 04-17-00571-CV, 2018 WL 521626, at *4 (Tex. App.—San Antonio Jan. 24, 2018, no pet.) (mem. op.) ("Simply exposing [the] child[ren] to the other parent's violence is a relevant consideration in determining a child's best interest." (citation omitted)); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12)(E) (providing court may consider whether parent has adequate parenting skills to protect child from repeated exposure to violence although violence may not be directed at child); *see also In re C.H.*, 89 S.W.3d at 28 (explaining evidence that proves one or more statutory grounds for termination also may be probative as to best interest).

In addition, there is significant evidence that Mother and Father continued their relationship without addressing their domestic violence, which suggests future emotional and physical danger to the children. *See Holley*, 544 S.W.2d at 371–72. Father did not complete a domestic-violence-prevention class, and Mother was dismissed from her family violence prevention program due to her inability to end her relationship with Father. While the parents downplayed the extent of their

continuing relationship, the recorded phone calls, in which the parents discuss a continued family life kept secret from the Department, reasonably suggests that the parents would continue their "lingering relationship" in the future, regardless of whether their domestic violence was addressed. *Cf. In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) ("A trier of fact may measure a parent's future conduct by his past conduct . . . ."). Moreover, Mother's failure to complete her family violence prevention program suggests she lacked the motivation to avail herself of beneficial resources. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11) (providing courts may consider willingness and ability of child's family to seek out, accept, and complete counseling services and willingness and ability of child's family to effect positive environmental and personal changes within reasonable period of time).

The evidence also shows that Mother abused illegal substances during the pendency of the case. Mother acknowledged a positive test result for methamphetamine from July 2023, and admitted using CBD and prescription painkillers, without a prescription, in April 2024. Mother also affirmed that she drank alcohol while in possession of her baby. While the Department tried to impose random drug testing, Mother responded to fewer than half of requests for random drug tests. Her final test, taken on the second day of trial, was unable to produce a result due to the temperature of the sample provided. Illegal drug use is relevant to multiple *Holley* factors, including the children's emotional and physical needs now and in the future, the emotional and physical danger to the children now and in the future, Mother's parental abilities, the stability of Mother's home, and the acts or omissions which may indicate an improper parent-child relationship. *See Holley*, 544 S.W.2d at 371–72. In addition, "[e]vidence that a parent continued to use illegal drugs even though the parent knew her parental rights were at risk is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature endangers a child's

well-being." *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.) (citations omitted).

While the record shows Mother completed a parenting class and engaged in counseling in 2023, the record also shows that in 2024, Mother did not continue with her counseling, she missed multiple visits with her children, and she did not verify employment or stable housing, after multiple verification attempts by the Department's caseworker. This evidence reasonably suggest that Mother may have lacked a stable home and a clear plan for the return of her children. *See Holley*, 544 S.W.2d at 371–72; *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) ("Stability and permanence are paramount in the upbringing of children." (citation omitted)). In contrast, the caseworker and the CASA testified that the four children were bonded with their foster parents, who were meeting their needs. The two foster families desired to adopt the children in their care and continue sibling relationships. In addition, Aiden and Ava expressed a desire to remain with their foster parents, and Anthony and Asher were too young to express a desire. *See Holley*, 544 S.W.2d at 371–72.

Viewing all of the evidence in the light most favorable to the best-interest finding and applying the *Holley* factors, we conclude that the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. We further conclude that any disputed evidence, viewed in light of the entire record, was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in the children's best interest. *See id.* Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

## IV. FATHER

### A. Predicate Grounds (D) and (E)

Father challenges the trial court's findings as to predicate grounds (D), (E), (N), and (O). We hold the evidence is legally and factually sufficient to support findings as to grounds (D) and (E) and do not reach Father's issues challenging the other predicate findings. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O); *In re D.B.S.*, 2021 WL 1608497, at *7; *see also* TEX. R. APP. P. 47.1.

Much of the analysis that applies to Mother applies to Father. For the reasons discussed, the evidence supports a conclusion that the parents' abusive relationship placed their children in endangering conditions or surroundings. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Moreover, Father's extensive criminal activity constituted an endangering course of conduct. *See id.* § 161.001(b)(1)(E). Father acknowledged five past criminal convictions, including convictions for assault, robbery, and drug possession with an intent to distribute. In July 2023, Father was arrested after removing his ankle monitor, in violation of a bond condition, and he remained confined through trial. While mere imprisonment does not constitute endangering conduct, "[a] parent's criminal history — taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists — can support a finding of endangerment." *In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021). As in *In re J.F.-G.*, Father's repeated and frequent incarceration for severe crimes, including robbery, assault, and drug possession with intent to deliver, endangered his children. *See id.* at 315 (holding father's pattern of escalating conduct, including robbery and sale of illegal drugs, risked and, in fact, resulted in separation of father from child and qualified as endangering conduct); *see also In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("When parents . . . repeatedly

commit criminal acts that subject them to the possibility of incarceration, that can negatively impact a child's living environment and emotional well-being.").

We hold the evidence is legally and factually sufficient to support the trial court's subsection (D) and (E) findings as to Father.

## B. Best Interest

Lastly, the evidence is legally and factually sufficient to support the trial court's best interest finding as to Father. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

As with Mother, the evidence that supports the endangerment findings also supports the trial court's best interest finding. *See In re C.H.*, 89 S.W.3d at 28. Additionally, Father, like Mother, acknowledged using methamphetamine during the pendency of the case. There is scant evidence in this record to suggest that Father was motivated to avoid future criminal activity. To the contrary, his long history of criminal activity and violent conduct suggests that Father was unable to achieve durable improvement and provide adequate care for his children now or in the future. *See In re J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices."); *Holley*, 544 S.W.2d at 371–72; *In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *7 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.) ("A child's emotional well-being can be negatively affected when a parent repeatedly commits criminal acts that subject the parent to incarceration, resulting in the parent's absence from the child's life and the inability to provide support, and thus creating an emotional vacuum in the child's life and subjecting the child to ongoing uncertainty regarding who will take care of him.").

According to the CASA, Father displayed poor parenting skills during his observed visit by encouraging the children to violence. In contrast, the caseworker and the CASA testified that

the children's needs were met in foster care, and the foster parents wished to adopt. *See* TEX. FAM. CODE ANN. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); *Holley*, 544 S.W.2d at 372; *see also In re J.W.*, 645 S.W.3d at 746 ("The best-interest prong . . . focuses on the child's well-being, safety, and development." (citation omitted)).

We hold the evidence is legally and factually sufficient to support the trial court's best-interest finding as to Father.

## V. CONCLUSION

We affirm the trial court's order of termination.

Rebeca C. Martinez, Chief Justice